(43 South. 887.)

No. 16,333.

ROBIDEAUX v. HEBERT et al.

(April 15, 1907. Rehearing Denied May 13, 1907.)

1. MASTER AND SERVANT — INJURY TO EMPLOYÉ—INDEPENDENT CONTRACTOR.

When one contracts to do and deliver certain specific work, which is not unlawful, and the manner of the doing of which, including the employment, payment, and control of the labor, is left entirely to him, he is an independent contractor, for whose acts and omissions in the execution of such contract the other contracting party is not liable, since the doctrine of respondeat superior has no application where the employé represents the employer only as to the lawful purpose of the contract, but does not represent him in the means by which that purpose is to be accomplished.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 146.]

2. SAME—DEFECTS IN MACHINERY.

Where the owner of a machine, not in its nature dangerous, turns it over to the use of another person, in apparent good order, he is not liable for injuries resulting at a later date to an employé of such other person, whether from undiscovered defects in such machine or from its misuse; and the case is the same, though the person to whom the machine is turned over be an independent contractor, who uses the machine in the execution of a contract with the owner.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 146.]

3. SAME—NEGLIGENCE.

An employer, who by his negligent handling of a machine, which he and his employés are operating, causes an accident whereby one of the employés is killed, is liable in damages to the widow and minor children of such employé.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 256.]

4. DEATH—ACTION BY WIDOW AND CHILDREN.

The widow and minor children, by second marriage, of one who loses his life through the negligence of another person, can exercise the right of action conferred by Act No. 71, p. 94, of 1884, for the recovery of the damages sustained by them, without joining as plaintiffs the decedent's minor children by a previous marriage.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 11, Death, §§ 35–46, 56–58.]

(Syllabus by the Court.)

Appeal from Fifteenth Judicial District Court, Parish of Calcasieu; Edmund Dennis Miller, Judge.

Action by Ofelie Robideaux, individually and as tutrix, against I. E. Hebert and another. Judgment for plaintiff against both defendants, and they appeal. Reversed as to the railroad company, and affirmed as to the defendant Hebert.

Williams & Williams, for appellant Hebert. Denègre & Blair and Pujo, Moss & Sugar, for appellant railroad company. Charles Arthur McCoy and Robert Lewis Knox, for appellee.

Statement of the Case.

MONROE, J. Plaintiff, individually and as tutrix, claims from I. E. Hebert and the Louisiana Western Railroad Company, in solido, certain damages resulting from the death of her husband, who lost his life, as she alleges, through their negligence, whilst assisting in the operation of a machine known as a "spreader." The defendant Hebert alleges that the machine in question was of modern type, without defects that could have been discovered by the most careful inspection, and that decedent was a man of mature experience, who was notified, when employed, that he must assume the risk attending his employment, and he denies that the death complained of was attributable to his fault or negligence.

The railroad company admits that it furnished Hebert with the spreader, but denies that the spreader was defective when furnished; and it alleges that Hebert was an independent contractor, for whom it is not

responsible, and that decedent was in his employ. The facts, as we find them, are as follows:

The company (meaning the railroad company, defendant herein) entered into a contract with Hebert, its codefendant, whereby he undertook to fill in (with earth) a trestle at Sabine River, in the parish of Calcasieu, at the agreed price of 30 cents per cubic yard, "pit measure," the company to transfer, free of charge, all tools and camp outfits, also laborers employed on the work, from Lake Charles to Sabine, and return to Lake Charles all tools and camp outfits on completion of said work; also to furnish locomotives, necessary flat cars, not to exceed 40, and work train crew; also to pay work train crew and furnish two camp cars. The work, it seems, also required the use of a spreader, which was likewise furnished by the company, and is a machine consisting of a flat car about 40 feet long and 4 feet high, upon the sides of which are attached by hinges what may be called "wings," made of wood and iron, which, when raised above the car, rest against a strongly braced frame, about 12 feet high, running fore and aft, on the top of the car. When lowered, the wings reach to about the level of the cross-ties on either side of the track, and, flaring out towards the rear, constitute, with the car itself, a sort of blunt-ended plow, which, when driven from behind (by a locomotive), pushes outward, and spreads, the earth piled immediately alongside the track.

The raising and lowering of the wings is accomplished by the use of compressed air, supplied by the locomotive to a large drum on the rear end of the spreader car, which drum, in turn, supplies two cylinders, situated near and across the middle of the car; the power being supplied to the wings from the cylinders through the medium of a piston (which pushes the wings out from their resting place against the frame) and of wire cables, which, running through blocks made fast to the top of the frame, are attached to the edges of the wings and serve ordinarily to lower them gently after they are started by the pistons, and to raise them to the positions from which they are started. If, when one of the wings is pushed out by the piston past the perpendicular, the power is not applied through the cable to break its descent, it falls of its own momentum. Upon the other hand, if the power is so applied after the descent begins, the fall is checked suddenly, and there results a shock and strain to the fastenings, including that by which the cable is attached to the edge of the wing.

The connection between the cable and the wing was effected by passing (what some of the witnesses call) a "clevis" through an eye made or fastened in the end of the cable and bolting it (the clevis) to the wing. The evidence tends to show that the clevis was made of a flat, iron rod, of forged steel, rounded (save at the ends, which were left flat) and curved, in the form of a staple, with offsets, or hips, at the junctions of the round part with the flat ends, and that the ends were mortised into the edge of the wing to the depth of the junctions mentioned, and there fastened by means of bolts, which passed through a sheathing of iron with which the outer side of the wing was covered, through the ends of the clevis, and through several inches of wood on either side of the ends. Upon the occasion of the accident here in question Hebert was stationed at the large drum, where by means of valves he controlled the power, and the decedent was on the car in such a position that, when the wing was lowered, the cable connecting it with the top of the frame must have come down near him.

The evidence leaves no doubt that the accident is to be attributed to one or the other

of two causes, to wit: Hebert applied the power to the piston cylinder, and thereby pushed the wing beyond the perpendicular, but failed at the proper moment to supply the other cylinder with the air required to ease the wing down, and by applying that power after the wing had begun to fall checked it so suddenly as to produce a strain to which the clevis was unequal, or else, the checking power having been applied at the proper time and the wing being on its way down, easily and gently, the clevis broke without any assignable reason. There is direct and positive testimony in support of both views. Several witnesses testify that the wing began to fall as soon as it passed the perpendicular, and others that it did not begin to fall until half way down. The probability seems to us to support the view first stated. Hebert's function was to start the wing through the pressure of the piston in one cylinder, and an instant later to hold it in check, through the pressure of the air in the other cylinder. He had two valves to handle, and by the slightest delay in the handling of the valve second in order the wing was certain to acquire the momentum proportioned to its weight and composition, etc., which, as the evidence shows, could only be thereafter checked by what may be called violence. It seems to us more likely that such delay should have occurred than that the clevis, made of forged steel, and strong enough (as one of the witnesses states), if sound, to sustain the weight of the entire machine, and which had theretofore responded to all calls made upon it, should have held the weight of the wing, under steady strain, until it was half way down, and should then have broken. There is no question as to the facts that the wing suddenly fell, and that the wire cable, having been released by the breaking of the clevis, flew back with great violence, striking the decedent on, and probably breaking, his neck, with the result that he died within a little while and without having spoken. Upon examination it was found that the clevis had been broken at the junction of the round part with the flat end, but whether at one end or both does not seem to us to be altogether clear; the blacksmith who was employed to mend it being a most unintelligent witness. The place in the clevis where the fracture occurred is, however, shown to have been somewhat, if not entirely, concealed from view by the iron sheathing of the wing, or the wood into which the ends of the clevis were mortised, or both. There is some testimony to the effect that the clevis would have been a "little stronger" if it had been so forged as to taper from the round to the flat, instead of with the hips or offsets; but there is no suggestion that, forged as it was, it would not have been strong enough for any strain legitimately imposed on it, if the metal had been sound. Upon the other hand, it is shown that such a machine should last about 20 years, and that the machine in question had been in use for about 3 years; that it had been inspected in March, 1905, and delivered to Hebert, and received by him, as in good order; and that it had been used by him from that time until the day of the accident, October 25, 1905, during which period it had been inspected and oiled every day. It is also shown that Hebert had, on occasions, occupied the position that decedent was occupying at the time of his death, and it is made quite evident that no one knew or suspected that there was any defect in the clevis.

On the trial of the case it developed that, whilst plaintiff represents the two minor children of her marriage with the decedent, there are two other minors, children of a former marriage, who are not represented. There was a verdict and judgment for plain-

tiff, and against both defendants in solido, from which they prosecute this appeal.

## Opinion.

It is clear from the evidence that the defendant Hebert contracted with the railroad company to do and deliver certain specific work, and that the manner of its doing, including the employment, payment, and control of the labor, was left entirely to him. He was, therefore, an independent contractor, for whose acts in the performance of a lawful contract his employer is not liable, since the doctrine of respondeat superior has no application where the employé represents the employer only as to the lawful purpose of the contract, but does not represent him in the means by which that purpose is to be accomplished, and the assertion of liability is based on something done or omitted in the use of such means. Peyton v. Richards, 11 La. Ann. 63; Gallagher v. Southwestern Exposition Association, 28 La. Ann. 943; Riley v. Steamship Co., 29 La. Ann. 791, 29 Am. Rep. 249; Sweeny v. Murphy, 32 La. Ann. 628; Moffet v. Koch, 106 La. 371, 31 South. 40; A. & E. Enc. of Law (2d Ed.) vol. 16, p. 187; Casement v. Brown, 148 U. S. 615, 13 Sup. Ct. 672, 37 L. Ed. 582. Nor can the company be held liable upon the basis of any supposed defect in the machine furnished by it to Hebert, since there is no suggestion in the evidence that the machine was not in good order when furnished, and it is shown that it was inspected at that time, and was delivered and received as in good order. Riley v. State Line Steamship Company, 29 La. Ann. 791, 29 Am. Rep. 249; King v. N. Y. C. & H. R. R. Co., 66 N. Y. 181, 23 Am. Rep. 37.

By what process of reasoning the jury condemned both defendants we have no means of knowing. The judge a quo, though affirming the verdict, informs the court that he does so in order to expedite the litigation, and he disapproves it in toto as it effects the company, and considers it excessive as to the other defendant. We appreciate the motive of our learned brother, but venture to suggest that a litigant whom a jury has illegally condemned and who applies for a new trial ought not to be subjected to the expense and trouble of an appeal. The well-established doctrine, that on the appeal the judgment appealed from will be presumed to be correct until the contrary, is shown from the record, is founded upon or expressed in the maxim, "Omnia præsumuntur rite et solemnita acta, donec probetur in contrarium," which is particularly applicable to judicial officers, and is not unfrequently appealed to with confidence in this court.

Our conclusion upon the facts being that the accident which caused the death of the husband and father of the plaintiffs was attributable to the failure of the defendant Hebert to check the descent of the wing of the spreader at the proper time, we are of opinion that his liability for the resulting loss and damage follows as a necessary legal consequence; for it is evident, from his testimony, that he knew that such failure would in all probability be dangerous and disastrous, and, if he did not know it, he should not have undertaken to operate the machine.

We can discover no reason why plaintiffs should go out of court because the minor children of the first marriage have not been joined with them. This is not a suit, it may be remarked, upon any right of action which the decedent might have had at the moment of his death (though we do not mean to say that it would make any difference if it were). It is brought by plaintiffs in their own right, under Act No. 71, p. 94, of 1884, amending Civ. Code, art. 2315, and conferring upon the widow and minor chil-

dren of one who has lost his life through the fault of another the right to recover from such other the damages sustained by them, or either of them; and whilst, no doubt, in such case, all the beneficiaries may join in the same suit, and it may be desirable that they should, they are not obliged to do so, and the failure or refusal of one of them to act cannot preclude the others. The plaintiffs now before the court are the widow and the two children of the last marriage; the one child being posthumous and the other about two years old. The amount allowed the widow is $1,000, and the amount allowed the two minors $3,000. The decedent was about 50 years old, and at the time of his death was enjoying good health, was earning $1.50 a day, and had a life expectancy of 20.91 years. Our brother of the district court suggests that the total amount allowed should be reduced to $1,500, and counsel for plaintiff urges that it be increased. We, however, find ourselves unable to adopt either suggestion. Fifteen hundred dollars would but poorly represent to the widow and two infants the care and earning capacity of the husband and father of whom they have been deprived. Upon the other hand, to allow them more than has been awarded would seem to us to be placing them in a better position financially than if Robideaux had not died, and would unduly oppress the defendant, who earns his livelihood by hard work.

It is therefore ordered, adjudged, and decreed that, in so far as the judgment appealed from condemns the Louisiana Western Railroad Company, said judgment be annulled, avoided, and reversed, and that as to said company plaintiffs' demand be rejected, and this suit dismissed, at their cost. It is further adjudged and decreed that in all other respects said judgment be affirmed; the costs of the appeal to be equally divided between plaintiffs and defendant I. E. Hebert.